(34 South. 763.)

No. 14,682.

### PAYNE & JOUBERT v. AMOS KENT BRICK & LUMBER CO., Limited.*

(April 27, 1903.)

ACTION ON CONTRACT—BREACH—DAMAGES IN RECONVENTION—WAIVER.

1. Plaintiffs sue for an amount they claim under a contract entered into with defendants.

Defendants aver breach of contract, and claim damages in reconvention.

Plaintiffs have a right to the amount claimed on the contract.

2. Defendants are entitled to part of the amount claimed in reconvention.

3. When the violation of a contract is active or positive, default is not requisite to the recovery of damages.

4. Performing a contract unskillfully, by constructing defective machinery on the premises of a person who had contracted for a first-class outfit and appliances, is an active violation of the contract. Levy v. Schwartz & Bro., 34 La. Ann. 214.

5. The defendants could not reasonably do otherwise than to accept the situation, and make the best use possible of the outfit and appliances in their defective condition. They did not thereby waive their right to damages.

6. The defendants failed to sustain part of their reconventional demand with sufficient evidence. To that extent, the demand is dismissed.

(Syllabus by the Court.)

Appeal from Twenty-Fifth Judicial District Court, Parish of Tangipahoa; Robert R. Reid, Judge.

Action by Payne & Joubert against the Amos Kent Brick & Lumber Company, Lim-

---

*Rehearing denied June 24, 1903.

·ited. Judgment for plaintiffs, and defendants appeal. Affirmed.

Harry H. Hall and O. P. Amacker, for appellants. Stephen D. Ellis, Lazarus & Luce, and Branch K. Miller, for appellees.

BREAUX, J. This action was brought to recover a balance of $3,033.33⅓ due on a contract entered into between plaintiffs and defendants on the 21st day of September, 1900, in accordance with the terms and conditions of which defendants bound themselves to pay $5,000 after complete performance as required. Defendants, by way of reconvention, set up that plaintiffs broke their contract, and that in consequence they have sustained damages in the sum of $7,625.47, for which they claim a judgment.

The judge of the district court rendered judgment for plaintiffs in the amount first above stated, claimed by them, and, on the reconventional demand, defendants recovered judgment for the sum of $1,500.

Defendants are the appellants. Plaintiffs, admitting that there was some delay in delivering the machinery, claim to have performed all that should have been expected under the contract; that they delivered the work as promised by them; that it was accepted, used, and employed for the purposes intended; that a satisfactory test was made of the machinery.

Plaintiffs, in their defense in reconvention, urge that they were not put in default; that defendants' letters only called attention of the plaintiffs to the fact that the contract had not been performed at the time stipulated, but not that the letters manifested any intention by defendants·to terminate the contract by reason of plaintiffs' delay.

Defendants' contention, on the other hand, is that plaintiffs bound themselves to make delivery by October 21, 1900, of the outfit, material, and appliances necessary for the construction of a Globe furnace kiln, complete; also two Graham's three-channel lumber carriers and one sawdust carrier; also three of Graham's hand-edged lumber stackers; also conveyors and chains—all as per specifications.

The capacity of the kiln, as set out in the contract, was that it would dry 40,000 feet of lumber, green from the saw, per day of 24 hours. Defendants state that the kiln and appliances were delivered by plaintiffs after the stipulated 30 days; that delivery in time was of the essence; that they waived nothing; that they only received plaintiffs' work after they had given to plaintiffs notice of the damages they would suffer.

In reference to details, defendants particularly complain of the Graham's three-channel lumber carriers sold by plaintiffs to them under the contract, as unsatisfactory and insufficient, and say that it was agreed that the carriers should convey lumber from 1 inch to 3¼ inches in thickness by 15 inches in width; that they did not carry lumber of that thickness. They complained of defective construction of nearly the whole outfit sold by plaintiffs.

Defendants admit that there was a test made of the, work, as alleged by plaintiffs, but only of one of the carriers, which was unsatisfactory, and that this test only served to demonstrate that it (this carrier) would not properly work.

Then, taking the position of plaintiffs in reconvention, defendants ask compensation ·for:

First. Destruction in value of ,2,141,156 feet of lumber, piled in its yards, unavoidably, in an unseasoned condition, by reason of the breach of contract, amounting to $6,123.47.

Second. By reason of stoppage caused by the failure of the carriers to operate as they should have operated, resulting in stopping the sawmill, for adapting radiators, and for rearranging channels and remedying defects in the stackers, $500 are claimed.

Third. Loss of orders in defendants' business, caused by delay in delivering the kiln, and the impossibility of drying the lumber to fill the orders, for which an amount of $1,000 is claimed.

Taking up the evidence of the case for its review, we note that it is generally understood that pine lumber, unseasoned, without passing through the kiln, stacked in large quantities, deteriorates. It becomes blue in a short time. It is not received in the upper grades of lumber, and in the lower grades it is open to objection. Customers of lumber esteem, above others, the bright stock, and generally purchase it. · It is usually preferred. The estimated difference in value, as

shown by the testimony, varies from $2 a thousand to $5; and that No. 1 common, while blue is admissible, it is not worth as much money on the market, by at least $1 a thousand. It is also made to appear by the testimony that while there is a difference in value between dry kiln lumber and lumber that is allowed to remain exposed, that value cannot be ascertained by any fixed rule. Much necessarily depends upon the grade, the quality of the lumber, the stacking, the season of the year. The secretary, treasurer, and general manager of the defendant company testified that they worked up much of this lumber. Some of it, because of its condition, was hard to work, and other portions are still on the company's hands. In consequence, this witness inferred that defendants' business for the year from December 1, 1900, to December, 1901, covering the period that defendants' works are charged with having been defective and deficient in defendants' service, was $2 less a thousand than for the year previous, although prices had advanced. Something, during his examination as a witness, was said by this officer of defendant company about smoke-kiln drying, to which the company might have resorted to minimize the damages. To which this witness replied that it was a crude way of drying lumber, and the lumber was exposed to great danger from fire; that he did not deem it proper to make any attempt to diminish his loss in that way.

Recurring to the asserted loss, it was ascertained, this witness informs us, by deducting the quantity sold from that which was stacked in his yard, and this in the yard served as his basis in arriving at the loss. It (the amount he claims) was an estimated loss of $3 on the gross, per thousand, between the kiln-dry and the air-dry lumber.

With reference to the second item for which defendants claim damages in reconvention, caused, as they aver, by loss of time, for labor in fitting radiators, and other items of asserted loss—in amount, $500—there were, unquestionably, delays. Plans were not sent as they had been promised. Alterations and changes had to be made in order to remedy defective conveyors, and other appliances failed to do their respective work.

In answer to questions, this witness (the general manager, before mentioned) replied in reference to this amount:

"I estimated that in this way: I took my pay roll, and endeavored to figure up, as near as possible, the number of hours we had lost; and I figured that we had—that my expenses were in the neighborhood of fifty dollars a day—and I figured that the aggregate loss of time was ten days."

In regard to the third and last item which makes up defendants' reconventional claim, growing out of loss of orders for lumber, for failure to deliver the kiln, $1,000, this witness testified:

"We had some orders that we had already taken in October for shipment in December or January. Those and a number of them had to be canceled."

One of these orders was from the Pullman Company, and the others are also specifically mentioned by this witness.

The testimony of plaintiffs in reconvention sought to rebut the testimony of the manager, who was their principal witness to establish facts connected with the controversy.

As relates to the outfit and appliances sold, there is testimony showing that the Graham three-channel lumber carriers were not altogether satisfactory, and that the defectiveness caused defendants' mill to be shut down on certain days. The record also discloses that plaintiffs were called upon a number of times to make delivery of machinery and appliances according to contract, and it was not done.

The following letter, dated in November, 1900, by defendants to plaintiffs, is a pattern of others:

"We are unable to put any of the work sent us together for want of bolts. There are no track bolts, nor are there any bolts for fastening the castings to furnaces or radiators. We also beg to call your attention to the fact that you have not answered our inquiry as to how we were to use seventeen foot columns when plans call for eighteen foot and the foundations built for the length. We note you are sending us small consignments of materials. We are frank to say that we are much chagrined at the manner in which you are filling this order and we are suffering material loss on account of your noncompliance with your agreement. The

masonry work is all finished except about three feet on the north side of the wall up to where the roof timber should go. You must ship the remainder at once."

Some days prior to the same month, defendants had written to plaintiffs:

"The agreed time in which you were to deliver us the kiln has long since passed and yet we have received no notice of shipment. The brickwork is well under way and we must have the furnaces and radiators at once. We have let the brickwork out by contract and we shall expect you to be responsible for any loss resulting from your delay in furnishing the ironwork."

Plaintiffs joined issue with defendants on appeal, and asked for an amendment of the judgment that would recognize the whole of their claim.

Plaintiffs objected and reserved a bill of exceptions on the ground that the reconventional demand was lacking in detail; no reference being made to the time, place, and other essential conditions to admit proof.

### Opinion.

In our view, there was a breach of contract. Without going into details, we deem it sufficient to state that part of the outfit and appliances was not delivered in accordance with the terms of the contract. The defectiveness compelled the defendants to stop their mill a number of times, and caused delays and losses, for which we think plaintiffs are liable.

Many of the pieces of the machinery did not fit; they had to be changed; and some of the appliances did not answer the purpose intended.

The defective execution of the contract in constructing a defective dry kiln and appliances, forming part of and attached to defendant's lumber plant, is of itself an active violation. This was the view taken in a number of cases. A thoroughly considered decision is of a somewhat recent date. The defendant had delivered an unskillfully constructed cotton press to plaintiff—not at all the press for which the contract called. The court held that, by constructing this defective press on defendant's premises, the plaintiff had committed an active breach of the contract. The decision sets forth that such is the uniform jurisprudence of this court.

The person who had suffered the damages could not avoid them. It is too late, with any degree of reason, to remove an outfit and appliances after they have been partly constructed. They are put on his property to stay, and it only remains for him to claim damages in case he is damaged by defective execution of the contract.

The defective machinery plays the part of the Old Man of the Sea. It cannot be shaken off, and defendants' only hope for relief is in obtaining damages for the loss, annoyance, and delay.

In the decision to which we have before referred, the court said:

"The delivery of an imperfect press, not conforming to the contract requirements, was not the delivery contemplated by the contract—was, on the contrary, an active violation of the contract." Levy v. Schwartz, 34 La. Ann. 214.

The reasoning in the just-cited decision is sustained by a number of decisions. It is quite similar to our case. We can think of no good ground upon which to arrive at a different conclusion. We deem it proper to adhere to a rule that has been followed for years, and to let it continue to be understood that the contractor who incumbers premises of a person for whom he undertakes to construct improvements must pay damages for constructing improvements which do not improve anything not constructed in accordance with contract.

Plaintiffs seek to meet defendants' reconventional demand with the plea that, as defendants have gone into possession of the construction, and made use of it, they have thereby waived their right to damages; that they had consented to performance, and allowed plaintiffs to go on with the work, and they were thereby concluded.

True, in order that there may be recovery in damages, it must appear that plaintiffs could not reasonably do otherwise than accept the situation in which the contractors had placed them; that they could not help themselves. Here, that such was the situation, we think the testimony clearly shows.

Plaintiffs, under the facts, should have thought of the possibility of incurring damages. The defendants, on the other hand, should join plaintiffs in endeavoring to do the best they possibly could with defective appliances.

It is well settled that the law requires the

contracting person injured by breach of contract to minimize the damages. The attempted use of appliances can be viewed in the light of seeking to avoid damages. It is considered as the use of property with the view of lightening loss on all parties concerned. The court said:

"We do not see why the defendant should be debarred from defending himself against what he considers an extravagant demand for repairs done to his property simply because he took possession of it. He may have been unaware of the unskillful workmanship of his employé until he had taken possession of his property. He may have been, by necessity, forced to take possession of his property, whether the repairs were properly done or not." Gordy v. Veazey, 25 La. Ann. 518.

The question had been several times considered and decided, nevertheless it was urged again as to the case above cited, and again it was held that the taking possession of defective work was not necessarily a bar to recovering damages for its defects.

As in the case before us, the improvement had become part of the realty, and the owner found himself with a defective press on his hands, with which he attempted to do for the best under the circumstances. The court said:

"In such cases a man is put in possession by the very construction of the work on the premises, as a concomitant of his possession of the premises themselves, and he has the right to make such use of it as its defective condition will admit of, without thereby waiving his right to damages."

A difference was drawn in the last-cited case between the use of mere chattels, such as a piece of furniture, or a carriage constructed under contract, and fixtures physically annexed or affixed to land, and which become part and parcel of the land. Levy v. Schwartz, 34 La. Ann. 214.

Plaintiffs' delay in executing the contract—a separate and distinct issue—has been dwelt upon at length in argument.

We will not stop to pass upon this ground. In our view, the damages were due to defective machinery, and, delay of itself does not enter to any great extent into the substantial issues of the case. It can well be decided without passing upon that issue, as

it appears to us that all damages reasonably can be traced to the defectiveness of the appliances. But if there are damages due to mere delay, it appears to us that the repeated demand, both verbal and in writing, made by defendants to plaintiffs to commence with the work and comply with their contract, was sufficient placing in mora to enable defendants to recover damages on that ground, if there are any damages other than those traced to the cause before mentioned.

We take up for decision the first item of damage for which plaintiffs sue, with the view of ascertaining the amount due for damages.

The damages defendants claim is the difference in value between kiln-dried price of lumber and that which is air-dried; i. e., the difference in price for lumber stacked and air-dried and lumber that is kiln-dried.

Defendants' contention is that, if plaintiffs had performed their contract, all their lumber would have been kiln-dried, and would have had greater value in the market than it had.

One of the owners, who is the secretary and general manager, alone, estimated defendants' loss at $3 a thousand feet. No other witness who knew anything about the quality of the lumber testified. Other witnesses knew nothing of the lumber. He (the secretary and general manager) estimated the loss, and made a general average, without, as a witness, submitting the statement upon which the general average is based. It does not appear that the facts regarding the quality of the lumber, its condition or deterioration, were submitted to the judgment of other witnesses (experts), who were experienced lumbermen, interested in other mills, to enable them to arrive at conclusion with any degree of certainty.

The quality of the lumber, the different grades, and the influence which may affect the price, the testimony fails to show. A round, large sum is claimed on the estimate of one witness. Nothing less than this large amount can be taken as a basis, although uncorroborated by other witnesses at the mill, who doubtless had the opportunity of forming an idea of the value of the lumber.

We do not for an instant question the sincerity of this witness, but this would not justify us in taking this estimate as the basis

upon which to render a judgment for so large a sum.

The whole question resolves itself into what he would have realized on this lumber if there had been no breach of contract. We do not think this is sufficiently shown to sustain a judgment.

Whilst it is possible to recover damages depending upon future events, it sometimes becomes proper to moderate them where the estimate depends upon future events.

Here there is no middle course possible—no medium to be consulted in order to see if the whole amount claimed should be allowed.

The whole estimate must be allowed, or none.

The testimony informs us that there were different grades of lumber, ranging from the bright to the most ordinary. The deterioration of the bright is great. That of the common is inconsiderable. In forming an estimate, the proportion of each should be shown, in order to arrive at an estimate of the difference in value of air-dried and kiln-dried lumber.

The experts testified that the difference in value between the air-dried and the kiln-dried lumber in the upper grades varies from $5 to $10 a thousand. In the lower grade it is very little. The secretary and manager considered all these different grades, he says, and adopted $3 as the difference in value in all grades.

In the estimate, a difference in the lower grade is found as great as upon the upper grade, and yet we are not informed of the details upon which the calculation is based.

There is frequently antagonism of ideas between creditors and debtors regarding estimates. Without the fact upon which it is based, it is difficult to determine between the one and the other.

No alternative is left us, save to decree that the claim in reconvention for deterioration of lumber is not sustained by sufficient evidence.

The other items, numbered 2 and 3, we think, are sustained by the proof, and that $1,500 were properly allowed by the district court on the reconventional demand.

It follows from the view before expressed that plaintiffs' motion on appeal for amendment of the judgment in their favor is rejected.

This brings us to the end of the issues of the case. With the evidence before us, we think that the judgment rendered should remain undisturbed.

The plea in reconvention being sustained only as to two of the items, amounting to the sum just mentioned, it is sustained, to that extent. With reference to the first item—for deterioration in value of lumber—the demand, not being sustained by sufficient testimony, will be dismissed as in case of nonsuit.

The law and the evidence being with plaintiffs on the main demand, the judgment on that demand is affirmed.

The law and the evidence being for defendants on the reconventional demand, to the extent before mentioned, it is affirmed. It is dismissed as in case of nonsuit to the extent that damage is demanded for deterioration of lumber, viz., No. 1 of the account.

Appellees to pay costs of appeal.