In December, 1945, the defendant, Thomas S. Keaty was having a house constructed on a property which he owned in the Parish of East Baton Rouge. On December 27th of that year, the plaintiff, J. W. Stabler, d/b/a Seaboard Plumbing Company, submitted an offer in writing to him to furnish the labor and material in installing certain plumbing fixtures in the house. The proposal read that he would furnish the material and install the fixtures for the sum of $635. The fixtures to be installed consisted of a 5 foot recess tub C. P. trim; 1-20 x 18 lavatory, C. P. trim; 1-Hanover closet with sheet covered white seat; 1-two-compartment white sink, C. P. trim; 1-20 gallon Butane water heater; 5 jar septic tank, and gas openings in each room. On December 31, the defendant accepted in writing, the terms, specifications and conditions of the proposal as being satisfactory and he authorized the plaintiff to execute the same.
Plaintiff went to work on the property and in the meantime the defendant requested that he furnish and install an extra lavatory at the price of $32.80 and an extra closet priced at $30, increasing the contract price to $697.80. The defendant paid him the sum of $254 leaving a balance due of $443.80 which he did not, and refused to pay. This suit is one instituted by the plaintiff to recover that balance and the additional sum of $7.50, the cost of preparing and having recorded, a lien affidavit against the property.
In his petition, after setting out the contract and alleging that all the materials and fixtures furnished were of first class character and that the work was done in a thorough and workmanlike manner, plaintiff alleges that he completed his work on March 26, 1946, and after having made several demands for payment, which were refused, he had the necessary affidavit prepared and recorded in order to protect his lien on the property and on April 24, 1946, sent a copy of the affidavit which he had had recorded, to the defendant by registered mail. He accordingly prays for judgment in the sum of $451.30 with recognition of his materialman's and laborman's lien against the property.
In answer to the demand made against him the defendant filed an answer in which he admits having entered into a contract with the plaintiff, all as is set out in the latter's petition, but denies owing him anything. He then assumes the position of a plaintiff in reconvention and avers that the plaintiff has neglected and refused to complete the contract which they had entered into though repeatedly requested to comply with its terms. He sets out that on June 20, 1946, he wrote a letter to the plaintiff calling his attention to several points in connection with the job which he wanted him to correct, copying the entire letter in his answer. He then goes on to aver that in addition to the faulty workmanship as pointed out in his letter, the plumbing system installed in his residence has been inspected by an official plumbing inspector who reported that a number of items did not conform to the standards of the plumbing code. These he enumerates as, first, *Page 911 
the safety valve on the hot water heater being installed on the pipe or pipes for cold water instead of on the hot water pipes as called for by correct plumbing practices; second, the entire water system should have been provided with drainage outlets so that it will drain correctly, the existing arrangement having caused unnecessary trouble and expense during a cold spell of weather experienced in February of 1948; and third, that the plumbing regulations require a septic tank of the capacity of 500 gallons, different from the type that was installed by the plaintiff. Further he alleges that the plaintiff installed the lavatory and fixtures in the bathroom in a position and in a manner causing considerable inconvenience in their use not to mention their unsightly appearance. Finally he alleges that because of the delay of the plaintiff in completing the job he was obliged to continue to rent the property he was occupying, for a period of three months, and had to pay rent at the sum of $35 per month.
All told therefore the defendant claims the sum of $765 in reconvention, itemized as follows: $300 — the cost of properly installing a septic tank of the type and capacity required by the plumbing code; $150 — cost of rearranging the fixtures in the bathroom; $50 — expenses caused during the cold spell of February, 1948, because of faulty drainage in the drainage outlets; $75 — permanent correction of faulty drainage; $105 — three months rental he was obliged to pay by reason of unnecessary delay caused by plaintiff in completing his work; $50 — cost of correctly installing piping for Butane gas system, and $35 — installation of safety valve on hot water heater.
The case went to trial in the lower court and resulted in a judgment in favor of the plaintiff for the full amount prayed for by him. The defendant's reconventional demand was specifically dismissed and he has taken this appeal.
The evidence reveals that this contract was entered into at a time, when, in order to obtain the better material for jobs of this kind, it was necessary to have a priority rating which the defendant did not have. The material furnished by the plaintiff under his contract may not have been the highest grade and standard, but apparently it was the best that he was able to obtain without a priority at the time and besides, it seems as though the defendant was anxious to get the job done and was willing to accept whatever could be supplied. As a matter of fact, he signed the contract accepting the plaintiff's proposal and it is therein written out exactly what the plaintiff was to furnish in the way of materials.
Although we hesitate to do so at the length that will be entailed, we deem it proper to take up the complaints made by the defendant one by one and discuss them in the light of the evidence which we have before us.
His chief complaint is with regard to the septic tank. He claims first, that plaintiff furnished a three jar tank instead of a five jar tank as called for by the contract. From the manner in which these tanks were installed it looks as though they appeared to be only a three jar tank but the evidence is definitely to the effect that there are five jars of 50 gallon capacity each, which is what the plaintiff agreed to furnish and install. The defendant says something about these tanks not having a bottom, but that seems to be purely a surmise on his part as the evidence clearly shows that the tanks do have bottoms. It looks as though the defendant had a vague suspicion that the tanks had no bottoms because sometime after they were used, it was discovered that a water well on the property, situated not far from the tank, became contaminated and he got it fixed in his mind that the contamination came from the contents of the septic tank which seeped through the ground and finally reached the water in the well. There is absolutely no proof to support the claim that the contamination in the water in the well, if there was any, came from the septic tank's contents. Another contention made by the defendant is that these tanks which total a 250 gallon capacity did not comply with the requirements of the State Sanitary Regulations as embodied in the plumbing code and which call for septic tanks of 500 gallons capacity. In this case it is only necessary *Page 912 
to state that the plaintiff furnished the tanks the contract called for. Defendant seems to contend that plaintiff, being a plumber should have known the regulations called for and should have advised him accordingly. But we see no reason why the defendant himself, who was having the house built and the plumbing work done should not have informed himself as to the requirements, if there were any, as well as the plaintiff. But even so the testimony is to the effect that the regulations which he now invokes in order to show the plaintiff's ignorance and his incapacity to do the work properly, do not apply to the area in which this house was being built. They are regulations governing work of this kind in the city of Baton Rouge and do not operate in the outlying districts in the country.
The next complaint of defendant which he seems to think very important is with regard to the sink that was furnished under the contract. He is not satisfied with the quality of the sink and claims that he expected the plaintiff, after the governmental restrictions were taken off, to change it for a metal sink. On what basis he expected the plaintiff to do this we are unable to say and he has not informed the court why he expected such a thing. He complains too that the sink had a crack in it and introduced a photograph in evidence to prove that. The plaintiff is positive that when his men installed the sink, and his men testified to that also, there was no crack in it and they are certain that they had nothing to do with the crack that presently exists. As a matter of fact, the defendant in his testimony doesn't specifically charge them with having cracked it in installing it and that seems to be more of a surmise on his part than anything else.
Another complaint on which he dwells at length is with regard to the installation of the lavatory and toilet in the bathroom. He produced another picture to show the unsightly appearance of these fixtures. What happened there was that he wanted the fixtures to be put in a certain place in the bathroom and putting them there jammed the lavatory against the door. In installing the frame of the door it became necessary to cut a bit around the lavatory so that the door would open and close. Whilst it must be admitted, from looking at this photograph, that it isn't of a very pleasing appearance, the fact is nevertheless that the defendant himself is the one who had them installed as they are and he should have known exactly what to expect as a result. The men working for the plumber carried out the orders given them and we don't think they could be blamed for doing so.
The next complaint is with respect to the safety valve on the hot water tank. This valve he says should be on the hot water and not on the cold water pipes as placed by the plaintiff's men. With regard to this however, some of the defendant's own witnesses testified that this valve could be placed on either the hot or cold water pipes and some of the testimony of other witnesses seems to be that the better way seems to be to place it on the cold water pipes as was done in this instance.
With regard to the faulty installation of the drainage outlets which defendant says caused him so much trouble during that cold spell in February, 1948, we agree with the district judge when he states that the evidence is insufficient to show any failure or lack of good workmanship on the part of the plaintiff. There was another picture introduced to show what appears to be a rather crude way of installing one of the pipes to which an outlet is attached but as we understand the testimony that was some of the defendant's own work in trying to correct what he thought was an improper installation.
We believe the trial judge has properly summed up the case when he stated that if there was any improper installation of any of the fixtures, the defendant should have made his complaints at the time and not wait until long after he had moved into the house and taken possession. As further stated by him, we are of the opinion that the plaintiff complied with the contract in a substantial manner and that he completed the work and furnished the material as quickly and in as. satisfactory a manner as the conditions. warranted at that time. *Page 913 
Finding no error in the judgment appealed from, it is hereby affirmed at the costs of the defendant, appellant herein.